**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **3RD EYE SURVEILLANCE, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 6:14-cv-00725** |
| | § | |
| **THE CITY OF FORT WORTH and** | § | **JURY DEMANDED** |
| **e-WATCH CORPORATION** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction opinion construes the disputed claim terms in U.S. Patent No. 7,323,980 ("the '980 Patent"). Plaintiff 3rd Eye Surveillance, LLC alleges that Defendant e-Watch Corporation infringes the '980 Patent. Plaintiff filed an opening claim construction brief (Doc. No. 95), to which Defendant filed a Response (Doc. No. 101), and Plaintiff filed a Reply (Doc. No. 107). The parties additionally submitted a Joint Claim Construction Chart pursuant to P.R. 4-5(d). Doc. No. 112. On May 12, 2016, the Court held a claim construction hearing. Upon consideration of the parties' arguments, and for the reasons stated herein, the Court adopts the constructions set forth below.

### OVERVIEW OF THE PATENTS

Plaintiff contends that e-Watch literally infringes the '980 Patent. The '980 Patent is the only patent in suit, and is entitled "Security System and Method with Realtime Imagery." '980 Patent. The disclosure of the '980 Patent relates generally to "provid[ing] secure, realtime video and/or other realtime imagery of a secured location to one or more emergency response agencies over a high-speed communications link, such as the internet." '980 Patent Abstract. The stated objective of the invention is to allow emergency response agencies and their

1

personnel to be better informed and prepared in responding to and preventing emergencies.

'980 Patent at 2:1–3.  The '980 Patent contains four independent claims (claims 1, 11, 21, and

31), which recite as follows:

1. A security system comprising:

an imaging device positioned at a secured location;
a computer system associated with a security system central
    monitoring station, said computer system configured to:
receive real-time imagery data from said secured location;
process the received imagery data;
generate additional information associated with the received
    imagery data;
identify an appropriate response agency from amongst a plurality
    of response agencies based on at least one of the additional
    information and the imagery data; and
transmit the received imagery data and the additional information
    to a computer system associated with a response agency.

11. A method of securing a location comprising the steps of:

generating real-time imagery data at a secured location;
transmitting the real-time imagery data to a security system central
    station over a network connection;
processing the received imagery data at the security system central
    monitoring station;
generating additional information associated with the received
    imagery data; and
transmitting the received imagery data and the additional
    information to response agency over a network connection,
    wherein the response agency is identified from among a
    plurality of response agencies based on at least one of the
    additional information and the imagery data by a computer
    system at the security system central monitoring station.

21. A method for providing real-time data to a response agency:

receiving real-time data from a secured location;
accessing additional information associated with the data;
identifying at least one response agency from amongst a plurality
    of response agencies based on the data; and
transmitting the data and the additional information to at least one
    computer system associated with the selected response agency,
    wherein said receiving, accessing, identifying, and transmitting

are performed by a computer system at a security system central monitoring station.

31. A method of securing a location comprising the steps of:

generating real-time imagery of a secured location;
transmitting the real-time imagery to a security system central station over a network connection;
processing the real-time imagery at the security system central station;
transmitting the real-time imagery from the security system central station to a response agency over a network connection; and
displaying the real-time imagery at the response agency, wherein the response agency is identified from amongst a plurality of response agencies by a computer system at the security system central station.

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.*

Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be

read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one

skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

In patent construction, "subsidiary fact finding is sometimes necessary" and the court "may have to make 'credibility judgments' about witnesses." *Teva v. Sandoz*, 135 S.Ct. 831, 838 (2015). In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Id.* at 841. "If a district court resolves a dispute between experts and makes a factual finding that, in general, a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention, the district court must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term *in the context of the specific patent claim under review*." *Id.* (emphasis in original). When the court makes subsidiary factual findings about the extrinsic evidence in consideration of the "evidentiary underpinnings" of claim construction, those findings are reviewed for clear error on appeal. *Id.*

## DISCUSSION

The parties dispute the meaning of the following claim terms, which are set forth herein:

## I. **"response agency" (Claims 1, 11, 13, 21, 28, 29, and 31)**

| Claim Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| **"response agency" (Claims 1, 11, 13, 21, 28, 29, and 31)** | "plain and ordinary meaning (e.g., 'agency capable of responding to, or designated to | "the police department, the fire department or an emergency medical service authorized to respond to specific emergency events, but does |

| | |
|---|---|
| respond to, real-time data/imagery/imagery data'). For example, an agency may include one of Federal, State, Municipal or other governmental organization, or third party organizations or persons, whose respective purposes are, in whole or in part, to serve and protect the general population, property owners, individuals, government institutions in the United States, companies, or other property." | not include an individual mobile response unit, except as specifically set forth in claim 28." |

Plaintiff bases its argument on the '980 Patent specification, arguing that Defendant's proposal for this term is overly narrow because it ignores the specification, which states "the emergency response agencies may be local, state, or federal agencies." Doc. No. 95 at 11, citing '980 Patent at 4:5–6. Plaintiff contends that because Defendant asks the Court to place unsupported limitations on this term, its proposal excludes at least the FBI and state agencies. Doc. No. 95 at 10. Plaintiff contends that "response agency" should at least include the FBI because specification states that if a security concern arises, "the computer system may generate an alarm signal or an equivalent thereof in order to immediately notify the appropriate emergency response agency, or agencies, such as the Federal Bureau of Investigation (FBI)." '980 Patent at 11:17–20. Plaintiff also points out that the specification refers to the National Security Agency (NSA). Doc. No. 107 at 8, citing '980 Patent at 11:11–14. Plaintiff argues that the specification makes it clear that "response agency" includes local, state, *and* federal agencies and that e-Watch's proposed definition is inconsistent with the specification. As such, Plaintiff asks the Court to decline to construe this term according to Defendant's proposal and to adopt its proposal. Doc. No. 107 at 7.

Defendant responds that 3rd Eye's proposed construction is vague, overly broad, and unsupported by the claims and specification. Doc. No. 101 at 15. Defendant also argues that Plaintiff's definition is indefinite because it requires knowledge of the definition of "real-time data/imagery/imagery data." *Id.* at 13. Defendant contends that the patent specification refers to "appropriate" first responders, which Defendant argues are "very specific first responders such as law enforcement, firefighters, and emergency medical care." *Id.* Defendant believes that Plaintiff's proposed definition includes inappropriate agencies such as the Red Cross and FEMA. *Id.* Defendant further argues that Plaintiff's proposal includes any agency with a purpose to "serve and protect" but many governmental agencies—such as the President, the FDA, the EPA, and members of congress—exist to serve and protect but should not be included in the definition of "response agency." *Id.* Instead, "response agency" should be a "typical first responder, which would not include a governmental agency or a third-party organization just because it has a duty to protect and serve." *Id.* at 15. Additionally, Defendant believes "response agency" does not include an individual response unit and argues that Plaintiff's proposed definition would improperly include agencies such as an individual firefighter or an individual EMS unit. *Id.* at 14. Instead, the central monitoring station must contact the response agency directly. *Id.*, citing '980 Patent Figure 3.

The specification is instructive on this claim term. As discussed above, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323. Additionally, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter*

*Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583).

When discussing how security alarm systems function generally, the specification states: "If it is appropriate to do so, the security service personnel may, upon confirmation of the alarm, contact an emergency response agency (e.g., the police department, the fire department or an emergency medical team)." '980 Patent at 1:39–43. The specification also explains that the current invention seeks to place realtime video in the hands of those trained to respond to emergencies such as "medical emergencies, fire, threats, violence, and even acts of terrorism." *Id.* at 1:64–67. The specification further offers the example that "if the server [ ] transmits an alarm notification signal indicating an unauthorized entry at 115 East Main Street, the police department or, if appropriate, a particular police precinct responsible for the geographical region covering 115 East Main Street would be identified and selected . . . ." *Id.* at 6:34–38.

On the other hand, the specification states that "the central monitoring station may be associated with a private security service or a government agency. In addition, the emergency response agencies may be local, state or federal agencies." Id. at 4:2–6. Further, when discussing infrared (IR) sensors—an alternative to video cameras—the specification notes that IR sensors may be used in situations where there is not much ambient light where it may be necessary to capture images of "large open areas, such as government or military installations, . . . ." *Id.* at 9:29–33. This language indicates that a "response agency" is not limited to the few agencies Defendant suggests.

Throughout the specification, the '980 Patent refers to an "appropriate response agency," and Defendant urges the Court to construe an "appropriate response agency" as "first responders," which may only be "the police department, the fire department or an emergency

medical service authorized to respond to specific emergency events, but does not include an individual mobile response unit, except as specifically set forth in claim 28." Defendant's argument is unconvincing because the specification includes preferred embodiments that suggest a "response agency" might include an agency not included in Defendant's list. For example, the specification unambiguously includes acts of terrorism in the list of reasons a response agency may be needed ('980 Patent at 1:64–67), and if the emergency was an act of terrorism, the appropriate response agency may not be a local agency. Further, the specification's reference to capturing images via IR during military installations indicates that an appropriate response agency must include more than what Defendant suggests because "[a] police department, [a] fire department or an emergency medical service" would be unlikely responders to a military emergency. *See* '980 Patent at 9:29–33.

Additionally, as Plaintiff points out, the specification also states that if a security concern arises, "the computer system may generate an alarm signal or an equivalent thereof in order to immediately notify the appropriate emergency response agency, or agencies, such as the Federal Bureau of Investigation (FBI)." *Id.* at 11:17–20. The specification also refers to the National Security Agency. *Id.* at 11:11–14. Notably, however, when referring to the NSA, the specification is discussing *where* a computer system may be located, not *which type* of agencies are appropriately considered "response agencies." Although the Court will not consider the specification's reference to the NSA as indicative of the patent's inclusion of federal agencies in "response agencies," there is strong support within the specification for the Court to reject Defendant's proposal even without that reference.

Construing this term as Defendant suggests would be reading "particular embodiments and examples appearing in the specification" into the claims, which is inappropriate claim

construction. *See Constant*, 848 F.2d at 1571. Additionally, if the Court were to interpret "response agency" as Defendant proposes, it would be "exclud[ing] a preferred embodiment from the scope of the claim," because it would be finding that a federal agency such as the FBI is not a "response agency" under the patent, even though the specification specifically included the FBI as an appropriate response agency. *See Globetrotter Software, Inc.*, 362 F.3d at 1381. Nothing in the claims or the specification indicates that this term is limited to "the police department, the fire department or an emergency medical service authorized to respond to specific emergency events." The specification's reference to the police department, the fire department, and an emergency medical service are merely examples of response agencies that may be appropriate in certain situations, but those examples do not limit this term to only those categories. Had the inventor intended to limit this term to the types of agencies Defendant suggests, then presumably he would have stated such in the specification and refrained from any reference to federal agencies. Accordingly, the Court rejects Defendant's proposed construction.

As such, the Court construes the term "response agency" as "a federal, state, or local organization capable of responding to an emergency and/or a perceived emergency."

## II.    "associated with" (Claims 1, 2, 3, 5, 7, 9, 10, 11, 14, 15, 19, 20, & 21)

| Claim Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| **"associated with" (Claims 1, 2, 3, 5, 7, 9, 10, 11, 14, 15, 19, 20, & 21)** | "plain and ordinary meaning (e.g., "configured to communicate with")." | This term is indefinite.<br><br>Alternatively, the Court should construe this term as "functionally connected to." |

Plaintiff contends that this term is definite, and should be given its plain and ordinary meaning. Doc. Nos. 95 at 10 & 107 at 9. Plaintiff also argues that Defendant's attempt to construe this term as "functionally connected to" creates ambiguity. Doc. No. 95 at 11. In

support, Plaintiff points out that the phrase "associated with" has appeared in 3,744 different patents, and it appears at least 55 times in the '980 Patent alone, 16 of which is in the claim language. *Id.*

At the hearing, Defendant asserted that although it originally proposed that the Court should construe this term as "functionally connected to," Defendant now believes this term is indefinite. Defendant has also filed a Motion for Summary Judgment of Indefiniteness (Doc. No. 99), in which it argued that "associated with" is an indefinite term. Plaintiff, however argues that because Defendant proposed "functionally connected to" as the construction of this term in the Joint Claim Construction Statement (JCC) and did not assert its argument that this term is indefinite at that time, the Court should not entertain any argument that this term is indefinite. Doc. No. 107 at 8–9.

In its Motion for Summary Judgment, Defendant argues that the claims using "associated with" are "indefinite because a POSITA has no way of determining the true association." Doc. No. 99 at 27. Defendant contends that "association with" could mean two things are associated by "location, employment, communication ability, ownership, accessibility to, controlled by, connected to, derived from, within the same jurisdiction as, etc.," and it is impossible to know from the patent which association is correct. *Id.* at 27–29. In response, Plaintiff contends that "associated with" is a term commonly used in patents and its meaning would be self-evident to a POSITA. Doc. No. 102 at 13.

Plaintiff believes the word "functionally" in Defendant's alternative proposal of this term creates ambiguity. Doc. No. 95 at 11. To support this point, Plaintiff discusses Claim 11, which includes the phrase "additional information associated with the received imagery data." *Id.* Plaintiff states that in that phrase, the "additional information" could be a fire alarm and the

"imagery data" could be an image received from a camera. Plaintiff argues if the Court were to accept Defendant's alternative construction of "functionally connected to," it would be saying that the fire alarm is functionally connected to (or a function of) the camera, and Plaintiff does not believe that definition is based in the patent. *Id.* at 12. Plaintiff contends that Defendant's proposed definition would "confuse and mislead the fact finder." *Id.* Defendant did not present argument on the alternative construction "functionally connected to" neither in its briefing nor at the hearing. Instead, Defendant rests entirely on its argument that this term is indefinite.

For the reasons explained in the Court's concurrent opinion on indefiniteness, the term "associated with" is definite, and the Court finds this term needs no construction.

**III.    ". . . based on at least one of the additional information and the imagery data . . ." (Claims 1 & 11)**

| Claim Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| ". . . based on at least one of the additional information and the imagery data . . ." (Claims 1 & 11) | No construction is needed; the ordinary meaning of claim language as understood by a person of skill in the art is readily apparent. | This phrase is subject to multiple interpretations and is indefinite. |

The parties break this term down into three parts: (1) "based on at least one of," (2) "additional information," and (3) "imagery data." The parties' argument on this term hinges primarily on the first portion of the term, "based on at least one of." Defendant argues that because Courts have interpreted "based on at least one of" in multiple ways, it is unclear which interpretation the inventor intended here, and therefore this term is indefinite. Doc. No. 99 at 10. Defendant argues that the patent only requires additional information to identify a response agency and does not require imagery data at all. *Id.* at 11. Defendant contends that because imagery data is not needed to identify a response agency, its inclusion in this phrase creates further indefiniteness. *Id.* at 11. Plaintiff argues that because all portions of this disputed term

can be defined, the term is not indefinite. Doc. No. 102 at 18. Plaintiff asserts that "based on at least one of" can either be conjunctive, requiring at least one type of data from each category (one additional information and one imagery data), or it can be disjunctive, requiring at least one piece of data from at least one of the elements (either one additional information or one imagery data). *Id.* at 15–17. Plaintiff argues that here, the phrase is intended to be used in the disjunctive. *Id.* at 17 (comparing this case to *Radware Ltd. v. A10 Networks, Inc.*, No. C-13-02024-RMW, 2014 WL 1572644, at *6–7 (N.D. Cal. Apr. 18, 2014). At the hearing, Defendant made further argument regarding the indefiniteness of this term and made clear that if the Court did not find this term indefinite, it should be construed in the conjunctive (requiring at least one additional information and one imagery data).

For the reasons explained in the Court's concurrent opinion on indefiniteness, the term ". . .based on at least one of the additional information and the imagery data . . . " is definite, and the Court construes it in the disjunctive (i.e., one or more additional information, one or more imagery data, or one or more of both).

## IV. "realtime imagery" and "real-time imagery" (Claim 31)

| Claim Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| **"realtime imagery" and "real-time imagery" (Claim 31 )** | "video and/or still images made available for viewing without intentional delay" | "a live video image produced by an imaging device positioned at a secured location." |

At the hearing, Plaintiff argued that "real-time" means "without intentional delay" and Defendant did not oppose that definition. The Court agrees with Plaintiff that "real-time" means "without intentional delay." Therefore, the only portion of this term that the parties disagree on is "imagery."

Plaintiff asserts that "real-time imagery" includes "any image captured by an imaging device, prepared for transmission, and transmitted for display without requiring accompanying fact, figures, calculations or other forms of data about that image or about the alarm itself." Doc. No. 95 at 13. Plaintiff distinguishes "real-time imagery" from "real-time imagery data" by stating the latter includes real-time imagery *plus* facts, figures calculations, or other data. *Id.* Contrary to Defendant's proposal, Plaintiff argues that real-time imagery is not necessarily a "live video image" because the specification describes imaging devices other than video cameras for securing a location—such as IR sensors and passive millimeter-wave (PMMW) sensors—and explains that those devices "will be of significant benefit to response agencies." *Id.* at 15, citing '980 Patent at 9:8–18, 18–21, 22–42, 43–62; *Id.* at 17. Therefore, Plaintiff believes "video and/or still images made available without intentional delay" more appropriately describes this term.

Defendant's Response does not support its proposed definition of "a live video image produced by an imaging device positioned at a secured location," and Defendant instead argues that "realtime imagery" is an indefinite term. Doc. No. 101 at 25–27. Plaintiff's Reply points out that in the JCC, Defendant provided a proposed definition for this term and did not assert that this term is indefinite. Doc. No. 107 at 9. Because of that, Plaintiff structured its briefing based on that proposed definition and believes that the Court should not entertain any argument that this term is indefinite. *Id.*

At the hearing, Defendant said that when looking at this term alongside "real-time data" and "real-time imagery data," one can only define two of the three.[1] Defendant went on to say that this term is indefinite because "real-time imagery" "*might* be a picture." In response, Plaintiff distinguished this term from "real-time data" by responding that "imagery" is "outside

---

[1] Defendant also made this argument in its briefing. Doc. No. 99 at 16. However, both in its briefing and at the hearing, Defendant failed to explain its conclusory proposition that one cannot define all three terms at once.

of data" and is "not quantifiable." In support of its proposition, Plaintiff provided the example that if one is watching a live security video feed, what he sees is simply "real-time imagery," because there is no quantifiable "data" associated with the video feed. However, Plaintiff asserted, if there is also a time stamp on the video feed, the time stamp would be considered "data" because "it is about the image he is seeing." During the hearing, Plaintiff also argued there is data that can be processed that has nothing to do with imagery data, such as biometric information pulled from a facial recognition software, perhaps data about a particular person (e.g. a person's address or whether someone has a criminal record). Plaintiff explains that these are "quantifiable pieces of data," and although Plaintiff did not state so specifically during the hearing, the Court presumes Plaintiff was attempting to distinguish this type of data as "real-time data." Therefore, Plaintiff believes that the three terms Defendant argues cannot be defined can, in fact, not only be defined but also distinguished from one another. Therefore, Plaintiff argues that these terms are not indefinite.

The '980 Patent specification is dispositive of this term. The specification states that real-time imagery is generated by an imaging device and explains some of the types of imaging devices available for such imagery, such as video cameras, IR sensors, and PMMW sensors. '980 Patent at 2:25; 9:5–62. Further, the specification states that "[l]ike realtime video, or other realtime imagery, the sound signals generated by the sensor, or sensors, would be transmitted to the computer system . . . ." *Id.* at 11:35–37. From these portions of the specification, one can deduce that the term "real-time imagery" includes video, but the specification also makes it clear that while video is a type of "real-time imagery," other types of imagery are also included in the term. In other words, "real-time imagery" includes—at the very least—imagery generated by video, IR sensors, and PMMW sensors. The fact that the specification mentions "realtime video,

or other realtime imagery," indicates that a "live video image," as proposed by Defendant, is too limiting.

Because one skilled in the art would be able to define this term to include video and imagery generated by IR and PMMW sensors, the term is not indefinite. However, the Court believes this term does require construction. Accordingly, the term "'realtime imagery' and 'real-time imagery'" is definite, and the Court construes this term as "imagery—as seen (1) by a sensor (e.g., IR or PMMW), (2) as video, and/or (3) as still images—made available for viewing without intentional delay."

## V. "security system central monitoring station" and "security system central station" (Claims 1, 2, 3, 5, 7, 11, 14, 15, 21, & 31)

| Claim Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "security system "central monitoring station" and "security system central station" (Claims 1, 2, 3, 5, 7, 11, 14, 15, 21, and 31) | plain and ordinary meaning (e.g., "central facility or operation that provides security surveillance") | "a prior art facility that is independently owned and/or operated by security service company, that is separate from the client, that is staffed by trained security professionals employed by the independent security service company, where a client's secured location is monitored from." |

The parties' arguments with respect to this term primarily revolve around an office action during the '980 Patent prosecution, during which the '980 Patent applicants argued: "the term 'security system central monitoring station' and the term, 'security system central station,' are well recognized by those in the security field. These terms refer to a facility associated with most security companies that monitor secured locations for their clients. A security system central station or central monitoring station is typically staffed by trained security professionals, who operate/monitor the computer and communication equipment at the facility." Doc. No. 95-6 at 94.

In its opening brief on claim construction, Plaintiff argues that this term should be given its plain and ordinary meaning. Doc. No. 95 at 17. Plaintiff contends that although the office action explanation discussed a facility that is "associated with" a security company, it imposed no limitation that the facility be "independently owned and/or operated by" a security company as Defendant suggests. *Id.* at 18. Instead, Plaintiff asserts, the facility could be "associated with" a security company even if operated by the police or the FBI instead of a third party security company. *Id.* Plaintiff points out that the preferred embodiments directly contradict Defendant's proposed definition by stating "the central monitoring station [ ] may be associated with a private security service *or* government agency." *Id.* at 20, citing '980 Patent at 4:2–5 (emphasis added). From that, Plaintiff argues that if the central monitoring station is associated with a government agency, it cannot also be associated with a private security service. *Id.* In other words, the central monitoring station *may be* associated with a private security service or it *may be* associated with a governmental agency, but the patent does not require one or the other. Additionally, Plaintiff contends that the prosecution history, the claims, and the specification do not support the limitation that the security system central station must be "staffed by trained security professionals employed by the independent security service company." *Id.* at 18.

Defendant asserts that the office action discussed above sheds light on the portion of its proposed definition that reads "that is separate from the client" because based on the office action statement by Plaintiff, "it is not reasonable for a [POSITA] to believe that the security company monitors a secured location for the client at that client's facility because a facility associated with a security company is not a facility associated with a client." Doc. No. 101 at 16, citing '980 Patent at 8:55–9:4 (stating that if a client wishes to check the secured location, he can connect to a website, which will connect him to the video server at his place of business or

residence). This statement indicates that the security system central station is separate from the client. With regard to the portion of Defendant's proposal that reads "a prior art facility," Defendant argues "both a 'security system central monitoring station' and a 'security system central station' are prior art" because even the applicant acknowledges that the definition is well known by those in the security field. *Id.* at 17.

With respect to the remainder of Defendant's proposed construction, Defendant argues that its proposed construction must prevail because (1) the specification language supports it, and (2) "3rd Eye is estopped from claiming that the definition . . . is more than as described in the File Wrapper because the '980 Patent was issued as a direct and immediate result of the inventor's actions of adding 'security system' immediately preceding 'central monitoring station' and 'central station' and the inventor's description of these terms in the File Wrapper as a third party facility." *Id.* at 18.

The phrase "security system central station" appears only twice in the specification, where the summary of the invention states "[t]he method involves generating realtime imagery of a secured location and transmitting this realtime imagery to a security system central station over a network connection. The realtime imagery is then transmitted from the security system central station to an emergency response agency over a network connection." '980 Patent at 2:47–54. However, the '980 Patent also refers to "central monitoring station," "central station," and "security service central station" throughout the specification. In the description of the preferred embodiments, the patent states "[t]he security system [ ] also includes a central monitoring station [ ] which is typically staffed by personnel employed by a security service" and "the central monitoring station [ ] may be associated with a private security service or a governmental agency." '980 Patent at 3:35–37; 4:3–5. Defendant argues that "central monitoring

19

station," "central station," and "security service central station" are not synonymous with ""security system central monitoring station" and "security system central station," even though it admits that the terms are used interchangeably in the patent. Doc. No. 101 at 19. The Court concludes that the inventor intended these phrases to be synonymous because the patent uses them interchangeably throughout.

The office action discussed above does support that the station be "staffed by trained security professionals," but it does not necessarily *require* the station to be staffed in this manner. The specification and the office action state that the station is *typically* staffed by trained security personnel. '980 Patent at 3:35–37; Doc. No. 95-6 at 94. The specification also states that the station can be associated with either a private security service *or* a government agency, indicating that it does not have to be "independently owned and/or operated by security service company," as Defendant suggests. This also indicates that the personnel are not necessarily required to be employed by the independent security service company. The Court is also of the opinion that Defendant's inclusion of "prior art facility" and "separate from the client" are unnecessary and unsupported by the specification.

Accordingly, the Court construes the term "central monitoring station" and "security system central station" as "a central facility that monitors a client's secured location."

## CONCLUSION

For the foregoing reasons, the Court adopts the constructions set forth above. Finally, although the parties' underlying claim construction briefing has been filed under seal, the Court sees no basis for this Order to remain under seal. Within **7 days** the parties shall file any and all objections to this Order being unsealed. Absent any objections or further Order from the Court, the Clerk's office is directed to unseal this Order 7 days from the issuance of this Order.

**So ORDERED and SIGNED this 8th day of June, 2016.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE